STATE of Iowa, Appellee,

v.

Michael Earl MOSES, Appellant.

No. 65195.

Supreme Court of Iowa.

June 16, 1982.

Rehearing Denied July 15, 1982.

Richard A. Knock and Joseph Moothart, of Mershon, Snow & Knock, Cedar Falls, for appellant.

Thomas J. Miller, Atty. Gen., Julie F. Pottorff, Asst. Atty. Gen., and David H. Correll, County Atty., for appellee.

Considered by LeGRAND, P. J., and HARRIS, ALLBEE, LARSON and SCHULTZ, JJ.

LeGRAND, Justice.

This is a consolidated appeal from two convictions for first degree murder and concurrent sentences to life imprisonment. We affirm the trial court.

Defendant was charged with murdering Deborah Lane on March 30, 1979. He was also accused of murdering Patricia Kniss on April 20, 1979. Defendant entered a plea of not guilty to each charge and gave notice of his intention to rely on the defenses of insanity and diminished responsibility. He waived his right to trial by jury, and the cases were consolidated for trial to the court. Defendant was found guilty of both crimes, was sentenced under section 902.1, The Code 1979, to serve a term of life in the penitentiary for each, and this appeal followed.

Defendant charges the trial court erred in numerous rulings, which present the following issues for determination:

   I.  Error in requiring defendant to furnish the State a list of his witnesses;

  II.  Error in denying defendant's motion for bifurcated trial on the issues of insanity and diminished responsibility;

 III.  Error in permitting hypothetical questions without proper foundation;

 IV.  Error in rulings on psychiatric testimony;

  V.  Error in receiving as exhibits, and permitting testimony concerning, physical evidence without establishing chain of custody; and

 VI.  Error in denying defendant's motions for judgments of acquittal on ground of insufficiency of evidence.

## I. Requiring Defendant to Provide Names of Witnesses

■ Defendant served notice of his intention to rely on the defenses of insanity and diminished responsibility. *See* Iowa R.Crim.P. 10(10)(b)(1). Pursuant to Iowa R.Crim.P. 10(10)(b)(2), defendant listed the expert witnesses he intended to call on these issues. The trial court ordered defendant to also identify all lay witnesses he intended to call. Defendant argues he was obliged under Iowa R.Crim.P. 10(10)(b)(2) to disclose only the names of *experts* who were to testify on sanity and diminished responsibility.

Defendant is correct as to the requirements of Iowa R.Crim.P. 10(10)(b)(2). This, however, does not settle the dispute at hand because the order directing defendant to identify the lay witnesses who were to testify on the issue of insanity was based on Iowa R.Crim.P. 12(3), which provides in pertinent part:

At or before the time of the taking of a deposition by a defendant under subsection 1 or 2 of this rule, the defendant shall list all witnesses expected to be called for the defense. There shall be a continuing duty throughout trial to disclose additional defense witnesses, and such witnesses shall be subject to being deposed by the State.

The order made specific mention that it was being entered pursuant to a stipulation between the county attorney and defense counsel "relative to proceedings under Rule 12, Iowa Rules of Criminal Procedure, [for] the deposing of witnesses on the issue of insanity as raised . . . on behalf of Michael Earl Moses."

Under these circumstances the trial court was clearly right in ordering defendant to disclose the names of the lay witnesses who were to testify on the insanity issue.

Defendant also complains because a supplemental order denied defendant the right to call any person as a witness whose name had not been disclosed. Defendant says the trial court had no authority to impose this sanction. We need not reach this issue in view of our finding that the trial court had authority to order disclosure and the defendant complied with the order.

## II. Bifurcated Trial

■ Defendant alleges error because the trial court denied his motion for bifurcated trial by which he sought to try the issues of sanity and diminished responsibility separately. Defendant relies strongly on *State v. Collins,* 236 N.W.2d 376, 383 (Iowa 1975) (Rawlings, J., concurring opinion) and *Collins v. Auger,* 577 F.2d 1107, 1109–10 (8th Cir. 1978), as authority.

We believe these cases are distinguishable. In the instant case, the State's experts did not testify to any incriminating statements or admissions made by the defendant. They evaluated defendant's mental condition without relying on such statements, if in fact any were made. Even under *Collins v. Auger* and the special concurrence in *Collins,* 236 N.W.2d at 383, defendant was not entitled to a bifurcated trial under present circumstances.

## III. Objections to Hypothetical Questions

The State used hypothetical questions to obtain expert opinion testimony. On this appeal, defendant objects to three of the questions propounded by the State on the ground that there were no facts in the record to support the questions asked.

■ The use of hypothetical questions is an accepted method for securing expert opinion testimony. *State v. Boner,* 203 N.W.2d 198, 200 (Iowa 1972). The hypothesis upon which the expert witness is asked to rely must be established by the facts in the record or by facts later introduced into the record. The facts, however, need not be shown by direct testimony but may arise as a fair inference from either direct or circumstantial evidence. *State v. Conner,* 241 N.W.2d 447, 460 (Iowa 1976).

■ The trial court has considerable discretion in deciding whether a basis exists for submitting hypothetical questions for jury determination. *Dougherty v. Boyken,* 261 Iowa 602, 607, 155 N.W.2d 488, 491

(1968); *State v. Hodge*, 252 Iowa 449, 459–60, 105 N.W.2d 613, 619 (1960), *appeal dismissed*, 368 U.S. 402, 82 S.Ct. 437, 7 L.Ed.2d 394 (1961). We do not reverse except for abuse of discretion. *Conner*, 241 N.W.2d at 460.

■ In the present case defendant first objects to a hypothetical question submitted to Dr. Loeffelholz which was designed to elicit his opinion on defendant's mental condition at the time of the Deborah Lane murder. The State wanted the doctor to assume that the murderer had placed an unknown object in the toilet bowl in the bathroom in the victim's home. Defendant argues there is no evidence to support this assumption. Defendant's argument misstates the premise upon which it relies by insisting there was no evidence that anyone had placed a *bloody* object in the toilet bowl. Although there was considerable discussion in chambers concerning the use of the word "bloody" in framing the question, the inquiry as actually posed to the witness made reference only to an "unknown object." At no time did the State designate the object as a bloody one.

This alone would warrant rejection of defendant's objection. In addition we find there was evidence to support the question as submitted. The matter was of minimal importance to the opinion asked and would not justify a reversal in any event. We find no merit in this objection.

The second hypothetical question to which objection was made asked the expert witness to assume certain facts from the manner in which defendant's brother had described his appearance and demeanor on an occasion immediately following the murder of Patricia Kniss. Defendant objected on the ground the evidence showed that the room in which these observations were made was so dark it was impossible to describe either the appearance or conduct of defendant at that time.

The dispute centers around this testimony. Craig Moses, defendant's brother, was watching a professional basketball game when the defendant arrived home late on the night of April 20, 1979. There was no lighting in the room except that provided by the television set. Defendant came in, inquired about the score, watched the game for a few minutes and went upstairs. He expressed some opinion about the game and was pleased Los Angeles was winning. He did not appear to be excited or upset. The witness testified that he was unable to describe defendant's clothing or to observe his facial expression because there was insufficient light. The hypothetical question was careful to include only those matters about which Craig Moses testified. It eliminated any description of clothing or facial appearance because the witness said he could not observe these.

The trial court did not abuse its discretion in permitting the hypothetical question to be submitted on this state of the record. The witness stated what he could and could not see and observe. It was arguable as to exactly what the witness could observe in view of the limited lighting. These were matters going to the weight of the evidence, rather than to its admissibility. We cannot say that the question as framed was not supported by any evidence in the record, and we find no merit in the objection made.

The third hypothetical question to which objection was lodged was directed to Dr. Michael Taylor in connection with the Deborah Lane murder. The evidence showed that at approximately 6:30 A.M. on that day the defendant drove another brother, Jeffrey, to work. The hypothetical asked Dr. Taylor to assume Jeffrey noted nothing unusual about defendant's actions or statements at that time. Defendant objected that this was not borne out by the record because Jeffrey had stated the defendant appeared "high" and angry.

Jeffrey was not entirely consistent in his testimony. At one time he said the defendant appeared tired. At another he said defendant was "high" and angry from the night before and at still another he stated he noticed nothing unusual about defendant. The State had the right to ask the hypothetical question based on its own theory consistent with the supporting evidence

in the record. Defendant was free to attack this version on cross-examination and to argue that the opinion expressed was not consistent with the record facts. *Speed v. State*, 240 N.W.2d 901, 911 (Iowa 1976). The State, however, was not obligated to include all the conflicting facts in its hypothetical presentation. There was sufficient evidence to submit this theory to the jury and to permit the jury to decide whether it was the true version.

## IV. *Rebuttal Medical Testimony*

The State introduced Dr. Loeffelholz as a witness to defendant's mental condition. He expressed the opinion that defendant was not suffering from any "significant psychosis" or from any "noticeable mental illness." He concluded defendant had a pronounced "anti-social personality."

As part of its case the defense relied upon several expert witnesses who testified concerning defendant's mental condition. Their conclusion was that he was a schizophrenic and that he had experienced "mild cerebral" damage.

The State called Dr. Taylor as a rebuttal witness. The defense objected that his testimony was not proper rebuttal testimony because it was not directed at "explaining, repelling, controverting, or disproving any evidence produced by the defense but was rather directed at augmenting psychiatric evidence previously presented in the case through Dr. Loeffelholz."

■ We find no merit in defendant's argument. Dr. Taylor testified that defendant lacked any of the symptoms associated with a schizoid personality. He also testified that the existence of "mild brain damage", even if it did exist, would not change his opinion. We believe this testimony was clearly rebuttal in nature. It was designed to refute the claim of schizophrenia, which had been introduced into the case by defendant's experts. The fact that the evidence might also have been used by the State in its main case does not preclude its introduction on rebuttal. *State v. Bakker*, 262 N.W.2d 538, 543 (Iowa 1978).

## V. *Chain of Custody Objection*

■ This objection applies to the Lane murder only. During the investigation following discovery of Mrs. Lane's body, the police seized certain items of evidence including knives, a knife box, hair curlers, clothing, and other incidental items. They were eventually sent to the Federal Bureau of Investigation in Washington for analysis and were introduced as physical evidence at defendant's trial. Objection was made that there was no proper showing of custody while the items were in possession of the Federal Bureau of Investigation. Although defendant seeks to enlarge upon his objection on this appeal, we limit our consideration to the objections made at trial. *State v. Pepples*, 250 N.W.2d 390, 393 (Iowa 1977).

■ The test for admissibility of physical evidence in the face of a chain-of-custody objection is that it be "reasonably probable tampering, substitution or alteration did not occur." *State v. Gibb*, 303 N.W.2d 673, 681 (Iowa 1981). The proof necessary to satisfy this rule differs from case to case, depending on the type of evidence under consideration. We require a strict showing in dealing with drugs, blood, and other substances which are subject to deterioration or change without detection. *Id.* We follow a less demanding rule when the evidence consists of solid property not easily altered or tampered with. *State v. Pierce*, 287 N.W.2d 570, 574 (Iowa 1980).

■ In the present case the evidence is of the latter kind. The testimony was undisputed that the articles were returned to the State by the Federal Bureau of Investigation in substantially the same condition as received. There is no suggestion that any tampering occurred. Under these circumstances the court did not abuse its discretion in permitting the evidence to be received.

## VI. *Insufficiency of Evidence*

### a. *Deborah Lane Murder*

Defendant challenges the sufficiency of the State's evidence to support a finding

that he killed Deborah Lane. Defendant's objection is in two parts. First, he argues the evidence is insufficient to prove he committed the act. Second, he insists that, even if this is found against him, there is insufficient evidence to establish his sanity and his ability to form the necessary intent at the time the act was committed.

Under *State v. Robinson*, 288 N.W.2d 337, 340–41 (Iowa 1980) and the cases there relied on, the evidence must be such that a rational factfinder could find defendant guilty beyond a reasonable doubt after considering all the evidence in the case. We view the evidence in the light most favorable to the State. *Id.* Although this trial was held prior to our *Robinson* decision and it is doubtful whether defendant preserved the sufficiency-of-evidence issue now relied on, we have nevertheless considered *Robinson* as applicable and have reviewed the evidence accordingly.

The events leading up to Deborah Lane's murder began on the evening of March 29, 1979, when defendant started a siege of drinking which lasted from 10:30 p. m., when he took his wife to work, until approximately 6:00 a. m. the next morning. During the night defendant played pool, played cards, engaged in a fight, and drank beer. After being up all night, he returned to his home about 6:30 on the morning of March 30th. He then took his brother to work and called his place of employment to say he would not report that day. His activities from about 6:40 a. m. (when he dropped his brother off at work) until shortly after 8:00 a. m. (when he returned home) remain unaccounted for.

Deborah Lane lived with her husband in Waterloo. She was employed by the City. When she did not report for work on March 30, 1979, several fellow employees, after making unanswered phone calls in an effort to find her, went to her home, where they found her body at approximately 9:25 a. m.

The evidence showed that a car similar to that owned by defendant was parked near the Lane garage at about 7:00 a. m.; that tire prints taken from the area were similar to the markings on the tires of defendant's

car; that a footprint found on the premises was identical with markings made by defendant's shoe; that neither the footprint nor the plastic box cover on which it was found were there when the victim's husband left for work that morning; that the time of death could not be precisely fixed but could have occurred between 7:00 a. m. and 8:00 a. m., the period for which defendant's conduct was unexplained. There was also evidence that defendant knew the Lanes, had been in their home, and knew the victim would be alone at that time of the morning.

All this evidence is circumstantial, but circumstantial evidence is just as compelling and just as convincing as direct evidence. *State v. O'Connell*, 275 N.W.2d 197, 204–05 (Iowa 1979). We believe there was substantial evidence from which a rational factfinder could find beyond a reasonable doubt that defendant's car was parked at the Lane home at the time of the murder; that it was his footprint found in the Lane home; that the footprint was made the morning of the murder between the time Mr. Lane left for work and the time the victim's body was found; and that defendant killed Mrs. Lane at that time and place. We discuss the question of defendant's sanity and the defense of diminished responsibility later.

### b. *Patricia Kniss Murder*

This murder presents a different situation. Defendant admitted killing Mrs. Kniss, and his detailed statement concerning her murder was not objected to at his trial. Defendant described how he kidnapped Mrs. Kniss, took her in his car to a place some distance from her home, and killed her by intentionally running over her with his car as she lay bound and trussed on the roadway where he had placed her. He does not now deny any of those acts. He alleges only that the State failed to prove he was sane and mentally able to form the necessary intent at the time of the crime.

### c. Insanity and Diminished Responsibility

We consider these defenses as they apply to both murders. The thrust of the defendant's argument is that the State's experts were permitted to testify to matters which were not the proper subject of expert opinion testimony and that without this evidence the State failed to prove defendant's sanity beyond a reasonable doubt.

More particularly, defendant objects because Dr. Loeffelholz was allowed to say a hypothetical person having certain characteristics attributable to defendant would have had sufficient mental capacity to know and understand the nature and quality of his acts and to distinguish right from wrong. These same questions were asked and answered, over timely objection, with reference to each of the two murders.

Substantially the same questions were put to Dr. Michael Taylor, again over defendant's objection, with substantially the same answers.

> Section 701.4, The Code 1979, provides: No person shall be convicted of any crime if at the time such crime is committed the person suffers from such a diseased or deranged condition of the mind so as to render the person incapable of knowing the nature and quality of the act he or she is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act.

At the outset it should be noted that the trial court refused to permit the psychiatrists to give an opinion that defendant was sane at the time of the murders. They were, however, allowed to answer questions concerning the particular matters referred to in section 701.4 which go to the issue of sanity.

▪ Our general rule is that opinion evidence should be received if it will aid the factfinder and is based on special training, experience or knowledge with respect to an issue in controversy. *State ex rel. Leas in re O'Neal*, 303 N.W.2d 414, 420 (Iowa 1981). We maintain a liberal policy toward the reception of opinion testimony and reverse only for abuse of trial court discretion. *Id.*

▪ We have consistently adhered to the policy of allowing expert opinion on the issue of defendant's sanity. *See, e.g., State v. Hahn*, 259 N.W.2d 753, 758 (Iowa 1977) (expert testified defendant recognized the difference between right and wrong); *State v. Lass*, 228 N.W.2d 758, 678 (Iowa 1975) (expert concluded defendant was sane at the time he killed his wife); *State v. Harkness*, 160 N.W.2d 324, 327 (Iowa 1968) (expert unable to say whether defendant was sane or insane); *State v. Arthur*, 160 N.W.2d 470, 473 (Iowa 1968) (expert testified that "defendant knew the difference between right and wrong"); *State v. Drosos*, 253 Iowa 1152, 1156, 114 N.W.2d 526, 528 (1962) ("neither [of defendant's experts] testified that defendant was unable to comprehend the nature and consequences of [defendant's] act or that he was unable to distinguish right from wrong"); *State v. Berry*, 241 Iowa 211, 221–22, 40 N.W.2d 480, 486 (1950) (expert testified that defendant was "insane" at the time of the alleged murder). Other authorities agree with this general rule. *E.g.*, 3 *Wharton's Criminal Evidence* § 609, at 173–74 (13th ed. 1973); 7 J. Wigmore, *Evidence* § 1937 (J. Chadbourn rev. 1978) (recognizing distinction between testimony on "sanity" and testimony on "capacity"); 31 Am.Jur.2d *Expert & Opinion Evidence* § 86, at 598 (1967); 23 C.J.S. *Criminal Law* § 867(c) (1961).

Defendant argues this has all been changed now because our acceptance of the *M'Naghten* rule as the definition of insanity has recently been codified in section 701.4, The Code 1979. *State v. Hamann*, 285 N.W.2d 180, 182 (Iowa 1979). Thus, defendant says this testimony runs afoul of this principle announced in *Grismore v. Consolidated Products Co.*, 232 Iowa 328, 361, 5 N.W.2d 646, 663 (1942):

> No witness should be permitted to give his opinion directly that a person is guilty or innocent, or is criminally responsible or irresponsible, or that a person was negli-

gent or not negligent, or that he had capacity to execute a will, or deed, or like instrument . . . . [Such matters] are mixed questions of law and fact. When a standard, or a measure, or a capacity has been fixed by law, no witness whether expert or non-expert, nor however qualified, is permitted to express an opinion as to whether or not the person or the conduct, in question, measures up to that standard. On that question the court must instruct the jury as to the law, and the jury must draw its own conclusion from the evidence.

The *Grismore* rule has since been applied in a variety of cases under widely differing circumstances. *E.g., Kooyman v. Farm Bureau Mutual Insurance Co.*, 315 N.W.2d 30, 37 (Iowa 1982) (witness not permitted to say defendant's conduct amounted to bad faith); *State v. Nimmo*, 247 N.W.2d 228, 230 (Iowa 1976) (witness not permitted to say that marijuana found on defendant "would be quite a bit more than a person would have on hand for personal use"); *State v. Swartz*, 244 N.W.2d 553, 555 (Iowa 1976) (witness not permitted to say that "marijuana was in the [defendant's] home to be sold or delivered by defendant and his wife" because it conveys conclusion of legal guilt); *State v. Ogg*, 243 N.W.2d 620, 621 (Iowa 1976) (witness not permitted to say "forty-six tablets of LSD far exceeds what one might possess for personal use" because statement expressed opinion of guilt); *Speed v. State*, 240 N.W.2d 901, 911 (Iowa 1976) (witness could testify that physician failed to use ordinary skill, but could not testify that doctor was negligent); *State v. Johnson*, 224 N.W.2d 617, 622 (1974) (expert on "tilltapping" not allowed to say crime of tilltapping had occurred); *State v. Galloway*, 167 N.W.2d 89, 94 (Iowa 1969) (polygraph expert could testify to defendant's lack of veracity but was not permitted to say that defendant was involved in the shooting); *M. Capp Mfg. Co. v. Hartman*, 260 Iowa 24, 28–29, 148 N.W.2d 465, 468 (1967) (building inspector prohibited from testifying that the building's structure violated zoning ordinance); *In re Ransom's Estate*, 244 Iowa 343, 371–72, 57 N.W.2d 89,

104–05 (1953) (witness not permitted to say whether testator was competent to make will because the inquiry involved a mixed question of law and fact and was a direct inquiry as to the testator's testamentary capacity).

We do not agree that the enactment of section 701.4 has had the far-reaching effect defendant claims. We hold that the law on this matter remains as it was prior to the statute. The cases upon which defendant relies are all cases in which the testimony went to establish an element of the crime charged. In the instant case we do not deal with an element of murder; rather we are concerned with insanity, which is a defense. *Hamann*, 285 N.W.2d at 182. Thus cases like *Ogg, Nimmo, and Johnson* are distinguishable.

Furthermore, defendant's mental condition is peculiarly a matter of expert evaluation and analysis. It is a question upon which factfinders need more than ordinary assistance from witnesses trained by education and experience to recognize mental disorders. In testifying on these issues, the expert expresses no opinion on the conduct of the defendant nor on his guilt or innocence. He testifies only as to a mental condition. This should be no different than testifying to a physical condition. Testimony as to a defendant's mental status does not become a mixed question of law and fact simply because the statute now delineates what the rule has always been. Significantly the statute does not attempt to define what the terms there used mean. It does no more than designate a condition of mind which will render one immune from criminal responsibility. Whether this condition exists in a particular case remains a question of fact, dependent of necessity to a great extent on expert opinion testimony.

In the present case both the State's expert witnesses stated in great detail the *facts* upon which the opinion was based. The recent case of *People v. Drossart*, 99 Mich.App. 66, 297 N.W.2d 863 (1980) discussed this question and reaches a result which we believe is the correct one. We set out the portion of that opinion which applies to the instant case:

It is important to note, therefore, that a qualified witness may testify that the accused is suffering from a mental condition involving "substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life", M.C.L. § 330.–1400a; M.S.A. § 14.800 (400a). In addition, the opinion rule does not prevent that witness from concluding that, as a consequence of the above mental condition, the accused "lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law". M.C.L. § 768.21a(1); M.S.A. § 28.1044(1)(1).

*Id.* at 74, 297 N.W.2d at 868.

Defendant argues *Drossart* did not address the objection raised here—that this was not a proper subject for expert testimony. We believe, however, the Michigan court did decide that very question in deciding the testimony was not "an improper legal conclusion invading the provinces of the judge and jury." 96 Mich.App. at 82, 297 N.W.2d at 871. We find no error in the trial court's ruling.

 One other issue remains concerning the expert opinion evidence. Defendant complains because the trial court did not permit his experts to testify about defendant's mental inability to entertain malice, although they did express their opinions on his ability to distinguish right from wrong and to understand the nature and quality of his acts. The trial court relied on *State v. Gramenz*, 256 Iowa 134, 142–43, 126 N.W.2d 285, 290 (1964). Defendant argues that *State v. Barney*, 244 N.W.2d 316 (Iowa 1976), undercuts *Gramenz*, if indeed it does not inferentially overrule that case. This claim is without merit. *Barney*, in fact, cites *Gramenz* with apparent approval. We believe what we said in *Gramenz* is controlling here. There was no error in the trial court's ruling.

### VIII. *Conclusion*

We have considered all the matters urged by defendant, whether specifically discussed or not. We find no reversible error, and the judgments are affirmed.

AFFIRMED.